IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84900-0-I |
| Respondent, | |
| v. | DIVISION ONE |
| LLOYD EDWIN RICHMOND, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — A neighbor saw Lloyd Richmond and Justin Allen together in the driveway of Richmond's house, heard three gunshots, and then saw Richmond use a winch to lift a large, tarp-covered object into his truck. Two months later, Allen's torso was found in remote Kittitas County. Richmond was charged with and convicted of murder in the second degree and unlawful possession of a firearm in the second degree. At sentencing, Richmond asked the court to impose an exceptional sentence downward of 17 months because of his advanced age and health issues. The trial court denied the request and sentenced Richmond to 183 months.

On appeal, Richmond contends that the court erroneously denied his request for an exceptional sentence downward because the court failed to consider his advanced age and ailing health as factors warranting an exceptional sentence. Because the court explicitly considered these factors and concluded that they did not warrant departure from the standard range, the court did not abuse its discretion. Therefore, we affirm.

FACTS

In 2021, eighty-seven-year-old Lloyd Richmond lived in and rented rooms out of his house in Everett, Washington. One of his tenants was Justin Allen. Tensions between Richmond and Allen worsened during the COVID-19[1] pandemic when Allen stopped paying his rent. But because of the eviction moratorium in effect at the time, Richmond was unable to evict Allen.

In the early morning hours of August 28, 2021, a neighbor heard loud arguing coming from outside. Later that afternoon, the neighbor was sitting outside on his porch when he heard three gunshots fired from Richmond's property. The neighbor ran to his porch steps and witnessed Richmond in his driveway, leaning over and looking at something on the ground. The neighbor watched as Richmond went quickly back and forth from a storage tent, gathering a tarp, large zip ties, and a large piece of cardboard. Richmond then used a boom winch attached to his truck to lift a large, tarp-covered mass off the driveway and into the truck bed. Richmond retrieved another tarp from the tent and covered the truck bed. The neighbor then witnessed Richmond spread a drying substance on the driveway. Richmond was later spotted disposing of Allen's car in an area that a neighbor described as a "dumping ground" for abandoned cars.

The next afternoon, Richmond used ratcheting straps to move the tarp-covered mass from his pickup truck into his SUV. He then drove away in the

---

[1] COVID-19 is the World Health Organization's official name for "coronavirus disease 2019," a severe, highly contagious respiratory illness that quickly spread throughout the world after being discovered in December 2019.

SUV and returned about seven hours later. Richmond told the other tenants that he had paid Allen $1,000 to move out.

A few days later, police arrested Richmond. Police discovered a firearm, ammunition, and blood on Richmond's shoes and in his SUV. Through testing, the blood samples were later matched to Allen. Months later, in October 2021, a hiker discovered Allen's torso nearby Stampede Pass.

Richmond was charged with and convicted of murder in the second degree and unlawful possession of a firearm in the second degree.

At sentencing, defense counsel requested an exceptional sentence below the standard range of 17 months, arguing that Richmond's advanced age and poor health warranted departure from the standard range. The State asserted that there were no mitigating factors and asked for a maximum term sentence of 234 months. The court then denied Richmond's request for an exceptional sentence downward. The court explained:

> As far as mitigating factors, the only information is age and health. As stated, usually when age is considered as a mitigating factor, it has to do with youth and the lack of development in the brain, which I consider a little bit of a diminished capacity. Again, there is no evidence of that here. Mr. Lloyd is a fully functioning, smart individual who is capable of making decisions.
>
> His health is another matter, and I recognize that he has not been in good health, particularly since he has been in a jail. As stated in the materials, it probably would be in his best interest, which is what they said, to be in an assisted living or an assisted care facility. But at the same time, there really isn't a basis to go outside of the standard range. The fact that he may or may not end up in prison for the rest of his life has nothing to do so much with the sentence but as to when he chose to commit this crime.
>
> And obviously those near the end of their lives cannot simply be excused for killing people. There has to be justice. . . . 17

3

months is clearly not proportionate to the seriousness of this offense and would not promote respect for the law in any way.

Regarding public safety, the court noted that although Richmond may be less likely to kill or seriously hurt someone than a younger person, he had already demonstrated that "with the right tools, it doesn't take a lot to do that." Taking Richmond's age and health into account, the court then imposed a midrange sentence.

Richmond appeals.

ANALYSIS

Richmond contends that the court erred by not considering his age or illness as mitigating factors. Because he claims that the court refused to consider these mitigating factors, Richmond argues that the court erred by not granting his request for an exceptional sentence below the standard range. He also asserts that the court erroneously relied on a hearsay affidavit from the State that Richmond would receive better health care treatment in prison when rejecting his request for an exceptional sentence downward. Because the court did consider whether Richmond's age and health conditions were mitigating factors, and then entered a midrange sentence that it determined was appropriate, we disagree. We also conclude that the court did not rely on the affidavit when it denied Richmond's request because the court stated that its decision was premised on the severity of the crime, not on whether Richmond would receive better health care in prison.

The Sentencing Reform Act of 1981 (SRA) "structures, but does not eliminate, discretionary decisions affecting sentences." RCW 9.94A.010. A

sentencing court may impose a sentence outside that range if it finds a mitigating or aggravating factor that provides "substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535. The SRA provides an illustrative list of mitigating factors that the sentencing court may consider to support an exceptional sentence. RCW 9.94A.535(1).

To determine if a nonstatutory mitigating factor can support an exceptional sentence, we employ the two-part "Grewe test." State v. Thomason, 199 Wn.2d 780, 789, 512 P.3d 882 (2022); State v. Grewe, 117 Wn.2d 211, 813 P.2d 1238 (1991). Under that test, a factor cannot support an exceptional sentence if (1) the legislature necessarily considered that factor when it established the standard range and (2) unless the factor is substantial and compelling enough to distinguish the crime at issue from others in the same category. Thomason, 199 Wn.2d at 789. In addition, the nonstatutory mitigating factor "must relate to the crime and make it more, or less, egregious." State v. Fowler, 145 Wn.2d 400, 404, 38 P.3d 335 (2002); accord State v. Law, 154 Wn.2d 85, 98, 110 P.3d 717 (2005).

In general, a sentence within the standard range may not be appealed. RCW 9.94A.585(1). However, a defendant may challenge the procedure by which a standard range sentence is imposed. State v. Garcia-Martinez, 88 Wn. App. 322, 329, 944 P.2d 1104 (1997). "A discretionary sentence within the standard range is reviewable in 'circumstances where the court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range.' " State v.

McFarland, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017) (internal quotation marks omitted) (quoting State v. McGill, 112 Wn. App. 95, 100, 47 P.3d 173 (2002)). "A trial court errs when 'it refuses categorically to impose an exceptional sentence below the standard range under any circumstances' or when it operates under the 'mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence for which [a defendant] may have been eligible.' " McFarland, 189 Wn.2d at 56 (quoting Garcia-Martinez, 88 Wn. App. at 330).

1. Whether the Court Refused to Consider Richmond's Age and Health

Richmond first contends that the court abused its discretion by refusing to consider advanced age and poor health as mitigating factors. We are unpersuaded.

The court explicitly stated that it was considering Richmond's age and illness and explained at length why those two factors did not justify an exceptional sentence. The court noted: "I haven't again heard anything that would tend toward leniency other than his age and his health. And I am taking those things into consideration." The court then imposed a midrange sentence despite noting that the severity of the crime and Richmond's subsequent behavior could justify a longer sentence. We conclude that the court exercised its discretion by considering whether Richmond's advanced age and ailing health could justify an exceptional sentence downward.

2.  Two-Part *Grewe* Test

Richmond next argues that the court erred by failing to apply two-part

*Grewe* test.[2]  Although the court did not explicitly mention *Grewe*, it did analyze

whether Richmond's age and health were substantial and compelling factors

warranting an exceptional sentence downward.  We conclude that the court's

analysis satisfied the *Grewe* test.  We also conclude that the court did not err in

concluding that Richmond's age and health were not substantial and compelling

factors to support an exceptional sentence downward because Richmond failed

to establish that they were crime-related.

As to the first *Grewe* step, neither party disputes that the legislature did

not consider advanced age or poor health in establishing the standard range for

second degree murder.[3]

As to the second *Grewe* step, neither party addresses whether advanced

age or poor health are sufficiently substantial and compelling to distinguish the

crime at issue from others in the same category.[4]  The court considered

Richmond's age and health and determined that they did not differentiate the

crime.  As to age, the court noted that when age is mitigating factor, it typically

has to do with "youth and the lack of development in the brain," almost akin to

---

[2]  Richmond refers to the *Grewe* test as the "O'Dell" test but O'Dell merely reiterated the *Grewe* test; it did not establish a new test.  Compare *Grewe*, 117 Wn.2d at 215-16 with State v. O'Dell, 183 Wn.2d 680, 690, 358 P.3d 359 (2015); see also Thomason, 199 Wn.2d at 789 (applying *Grewe* test post-O'Dell).

[3]  The State does not address the *Grewe* test.

[4]  In lieu of its own analysis, the State merely quotes the trial court's reasoning and concludes that advanced age and failing health are not substantial or compelling reasons to justify an exceptional sentence downward.

"diminished capacity," and that there was no evidence that Richmond's age affected his decision making capability.  As to health, the court acknowledged that Richmond "ha[d] not been in good health" and that "it probably would be in his best interest . . . to be in an assisted living or an assisted care facility."  But the court then concluded that neither Richmond's age or health were compelling reasons for an exceptional sentence.  The court reasoned that "those near the end of their lives cannot simply be excused for killing people" and that "17 months is clearly not proportionate to the seriousness of this offense and would not promote respect for the law in any way."  The court stated:

> So I am going to impose a standard range sentence.  I haven't again heard anything that would tend toward leniency other than his age and his health.  And I am taking those things into consideration.  I am taking into consideration, you know, essentially, he has already outlived average life expectancy for a male . . . but I think that here I'm going to impose a midrange sentence, which is 183 months or 15 and a quarter years.  I just don't see any reason to go outside that midrange.  If anything, the facts and what happened afterwards might lean towards the higher end, but I'm weighing that with his health and his age in giving the midrange.

The court did not err in imposing a midrange standard sentence. Richmond failed to successfully argue that his age and illness were sufficiently crime-related to justify an exceptional sentence downward.  For example, one of the declarations Richmond submitted in support of an exceptional sentence noted that Richmond's symptoms did not start until October 2021, several months after he murdered Allan.  Moreover, after considering his age and health, the court exercised its discretion by imposing a shorter sentence than it believed the severity of the crime warranted.  The court did not err.

8

Still, Richmond maintains that the court erred by concluding age and health were not crime-related. He contends that his age and health are crime-related because they impact his risk for recidivism. For age specifically, Richmond argues that the court should have considered his risk for recidivism rather than focusing on age as it relates to mental culpability. These arguments miss the mark. Although risk of recidivism is contemplated by the SRA and the court may consider it during sentencing, this inquiry is separate from whether a factor is crime-related as to warrant an exceptional sentence. Whether a factor is crime-related relates to whether a factor affected the commission of the crime at issue, not future risk of committing offenses. Here, the court considered both Richmond's risk for recidivism and whether his age and health related to the commission of the crime. As to his risk for recidivism, the court explained:

> I agree that he may be less likely to kill or seriously hurt someone else than would a younger person. But as we have seen, with the right tools, it doesn't take a lot to do that, and also I would not count Mr. Richmond out necessarily.

As to whether age was a crime-related factor, the court noted that "there is no evidence" that Richmond's age impacted the commission of the crime and that he "is a fully functioning, smart individual who is capable of making decisions." As to health, the court acknowledged that Richmond "has not been in good health" and that "it probable would be in his best interest . . . to be in an assisted living or an assisted care facility." But the court then noted that Richmond's health "really isn't a basis to go outside the standard range." The court did not abuse its discretion because it considered whether Richmond's age

and health were crime-related factors and also weighed their effect on his risk for recidivism. The court did not abuse its discretion by refusing to enter an exceptional sentence downward.

### 3. Reliance on Speculation

Richmond also asserts that the court erroneously speculated that "prison is often better for people" and that this statement is belied by the evidence. In support of his position, Richmond cites several news articles and studies detailing poor health services across the Department of Corrections. We are unpersuaded. The record does not reflect that the court relied on this speculation to deny Richmond's request for an exceptional sentence.

### 4. Reliance on Hearsay Declaration

Lastly, Richmond claims that the court impermissibly relied on a hearsay affidavit from the State to reject his request for a mitigated sentence. We disagree.

Before sentencing, both parties submitted sentencing memoranda with supporting declarations. Richmond's memorandum included a letter from ARNP[5] Dan Miller, an independent licensed medical provider working for Snohomish County Jail. Miller opined that Richmond "would be better served in a long-term care facility." In response to Miller's letter, the State submitted a declaration from Jamie Kane, the corrections bureau chief for Snohomish County. Kane clarified that Miller's views were not those of the Snohomish County Sheriff's Office and noted that the Department of Corrections (DOC) has facilities designed to

---

[5] Advanced registered nurse practitioner.

successfully manage inmates with health conditions. The State also provided a declaration from deputy prosecuting attorney Sarah Johnson, in which Johnson relayed information from Darren Chlipala, a house services administrator with the DOC, about healthcare options in prison.

Though the statements from Chlipala in Johnson's declaration are clearly hearsay, there is no indication that the court relied on them during sentencing. The court briefly referenced the parties' supporting declarations, but only focused on Richmond's materials. The court noted: "As stated in the materials, it probably would be in his best interest, which is what they said, to be in an assisted living or an assisted care facility." This statement clearly references the letter from Miller and does not relate to any of statements attributed to Chlipala in Johnson's declaration. The record makes clear that the court did not rely on hearsay in denying Richmond's request for an exceptional sentence.

We affirm.

_____
Smith, C.J.

WE CONCUR:

_____
Díaz, J.

_____
Dwyer, J.